# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 23, 2007          Decided July 3, 2007

No. 05-5139

MARRITA MURPHY AND
DANIEL J. LEVEILLE,
APPELLANTS

v.

INTERNAL REVENUE SERVICE AND
UNITED STATES OF AMERICA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02414)

———

On Rehearing

———

*David K. Colapinto* argued the cause for appellants. With him on the briefs were *Stephen M. Kohn* and *Michael D. Kohn.*

*Richard R. Renner* was on the brief for amici curiae No FEAR Coalition, et al. in support of appellants.

*Gilbert S. Rothenberg*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, *Richard T. Morrison*,

Deputy Assistant Attorney General, and *Kenneth L. Greene* and *Francesca U. Tamami*, Attorneys. *Bridget M. Rowan*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Marrita Murphy brought this suit to recover income taxes she paid on the compensatory damages for emotional distress and loss of reputation she was awarded in an administrative action she brought against her former employer. Murphy contends that under § 104(a)(2) of the Internal Revenue Code (IRC), 26 U.S.C. § 104(a)(2), her award should have been excluded from her gross income because it was compensation received "on account of personal physical injuries or physical sickness." She also maintains that, in any event, her award is not part of her gross income as defined by § 61 of the IRC, 26 U.S.C. § 61. Finally, she argues that taxing her award subjects her to an unapportioned direct tax in violation of Article I, Section 9 of the Constitution of the United States.

We reject Murphy's argument in all aspects. We hold, first, that Murphy's compensation was not "received ... on account of personal physical injuries" excludable from gross income under § 104(a)(2). Second, we conclude gross income as defined by § 61 includes compensatory damages for non-physical injuries. Third, we hold that a tax upon such damages is within the Congress's power to tax.

## I. Background

In 1994 Marrita Leveille (now Murphy) filed a complaint

with the Department of Labor alleging that her former employer, the New York Air National Guard (NYANG), in violation of various whistle-blower statutes, had "blacklisted" her and provided unfavorable references to potential employers after she had complained to state authorities of environmental hazards on a NYANG airbase. The Secretary of Labor determined the NYANG had unlawfully discriminated and retaliated against Murphy, ordered that any adverse references to the taxpayer in the files of the Office of Personnel Management be withdrawn, and remanded her case to an Administrative Law Judge "for findings on compensatory damages."

On remand Murphy submitted evidence that she had suffered both mental and physical injuries as a result of the NYANG's blacklisting her. A psychologist testified that Murphy had sustained both "somatic" and "emotional" injuries, basing his conclusion in part upon medical and dental records showing Murphy had "bruxism," or teeth grinding often associated with stress, which may cause permanent tooth damage. Noting that Murphy also suffered from other "physical manifestations of stress" including "anxiety attacks, shortness of breath, and dizziness," and that Murphy testified she "could not concentrate, stopped talking to friends, and no longer enjoyed 'anything in life,'" the ALJ recommended compensatory damages totaling $70,000, of which $45,000 was for "past and future emotional distress," and $25,000 was for "injury to [Murphy's] vocational reputation" from having been blacklisted. None of the award was for lost wages or diminished earning capacity.

In 1999 the Department of Labor Administrative Review Board affirmed the ALJ's findings and recommendations. *See Leveille v. N.Y. Air Nat'l Guard*, 1999 WL 966951, at *2-*4 (Oct. 25, 1999). On her tax return for 2000, Murphy included the $70,000 award in her "gross income" pursuant to § 61 of the

IRC.  *See* 26 U.S.C. § 61(a) ("[G]ross income means all income from whatever source derived").  As a result, she paid $20,665 in taxes on the award.

Murphy later filed an amended return in which she sought a refund of the $20,665 based upon § 104(a)(2) of the IRC, which provides that "gross income does not include ... damages ... received ... on account of personal physical injuries or physical sickness."  In support of her amended return, Murphy submitted copies of her dental and medical records.  Upon deciding Murphy had failed to demonstrate the compensatory damages were attributable to "physical injury" or "physical sickness," the Internal Revenue Service denied her request for a refund.  Murphy thereafter sued the IRS and the United States in the district court.

In her complaint Murphy sought a refund of the $20,665, plus applicable interest, pursuant to the Sixteenth Amendment to the Constitution of the United States, along with declaratory and injunctive relief against the IRS pursuant to the Adminstrative Procedure Act and the Due Process Clause of the Fifth Amendment.  She argued her compensatory award was in fact for "physical personal injuries" and therefore excluded from gross income under § 104(a)(2).  In the alternative Murphy asserted taxing her award was unconstitutional because the award was not "income" within the meaning of the Sixteenth Amendment.  The Government moved to dismiss Murphy's suit as to the IRS, contending the Service was not a proper defendant, and for summary judgment on all claims.

The district court denied the Government's motion to dismiss, holding that Murphy had the right to bring an "action[] for declaratory judgments or ... [a] mandatory injunction" against an "agency by its official title," pursuant to § 703 of the APA, 5 U.S.C. § 703.  *Murphy v. IRS*, 362 F. Supp. 2d 206,

211-12, 218 (2005).  The court then rejected all of Murphy's claims on the merits and granted summary judgment for the Government and the IRS.  *Id.*

Murphy appealed the judgment of the district court with respect to her claims under § 104(a)(2) and the Sixteenth Amendment.  In *Murphy v. IRS*, 460 F.3d 79 (2006), we concluded Murphy's award was not exempt from taxation pursuant to § 104(a)(2), *id.* at 84, but also was not "income" within the meaning of the Sixteenth Amendment, *id.* at 92, and therefore reversed the decision of the district court.  The Government petitioned for rehearing en banc, arguing for the first time that, even if Murphy's award is not income, there is no constitutional impediment to taxing it because a tax on the award is not a direct tax and is imposed uniformly. In view of the importance of the issue thus belatedly raised, the panel sua sponte vacated its judgment and reheard the case.  *See Consumers Union of U.S., Inc. v. Fed. Power Comm'n*, 510 F.2d 656, 662 (D.C. Cir. 1975) ("[R]egarding the contents of briefs on appeal, we may also consider points not raised in the briefs or in oral argument.  Our willingness to do so rests on a balancing of considerations of judicial orderliness and efficiency against the need for the greatest possible accuracy in judicial decisionmaking.  The latter factor is of particular weight when the decision affects the broad public interest.") (footnotes omitted); *see also Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C. Cir. 1986) ("The rule in this circuit is that litigants must raise their claims on their initial appeal and not in subsequent hearings following a remand.  This is a specific application of the general waiver rule, which bends only in 'exceptional circumstances, where injustice might otherwise result.'") (quoting *Dist. of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1085 (D.C. Cir. 1984)) (citation omitted).  In the present opinion, we affirm the judgment of the district court based upon the newly argued ground that Murphy's award, even

if it is not income within the meaning of the Sixteenth Amendment, is within the reach of the congressional power to tax under Article I, Section 8 of the Constitution.

## II. Analysis

We review the district court's grant of summary judgment de novo, *Flynn v. R.C. Tile*, 353 F.3d 953, 957 (D.C. Cir. 2004), bearing in mind that summary judgment is appropriate only "if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Before addressing Murphy's claims on their merits, however, we must determine whether the district court erred in holding the IRS was a proper defendant.

## A. The IRS as a Defendant

The Government contends the courts lack jurisdiction over Murphy's claims against the IRS because the Congress has not waived that agency's immunity from declaratory and injunctive actions pursuant to 28 U.S.C. § 2201(a) (courts may grant declaratory relief "except with respect to Federal taxes") and 26 U.S.C. § 7421(a) ("no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person"); and insofar as the Congress in 28 U.S.C. § 1346(a)(1) has waived immunity from civil actions seeking tax refunds, that provision on its face applies to "civil action[s] against the United States," not against the IRS. In reply Murphy argues only that the Government forfeited the issue of sovereign immunity because it did not cross-appeal the district court's denial of its motion to dismiss. See FED. R. APP. P. 4(a)(3). Notwithstanding the Government's failure to cross-appeal, however, the court must address a question concerning its jurisdiction. *See Occidental Petroleum Corp. v. SEC*, 873 F.2d

325, 328 (D.C. Cir. 1989) ("As a preliminary matter ... we must address the question of our jurisdiction to hear this appeal").

Murphy and the district court are correct that § 703 of the APA does create a right of action for equitable relief against a federal agency but, as the Government correctly points out, the Congress has preserved the immunity of the United States from declaratory and injunctive relief with respect to all tax controversies except those pertaining to the classification of organizations under § 501(c) of the IRC. *See* 28 U.S.C. § 2201(a); 26 U.S.C. § 7421(a). As an agency of the Government, of course, the IRS shares that immunity. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) (agency "retains the immunity it is due as an arm of the federal sovereign"). Insofar as the Congress in 28 U.S.C. § 1346(a)(1) has waived sovereign immunity with respect to suits for tax refunds, that provision specifically contemplates only actions against the "United States." Therefore, we hold the IRS, unlike the United States, may not be sued *eo nomine* in this case.

B. Section 104(a)(2) of the IRC

Section 104(a) ("Compensation for injuries or sickness") provides that "gross income [under § 61 of the IRC] does not include the amount of any damages (other than punitive damages) received ... on account of personal physical injuries or physical sickness." 26 U.S.C. § 104(a)(2). Since 1996 it has further provided that, for purposes of this exclusion, "emotional distress shall not be treated as a physical injury or physical sickness." *Id.* § 104(a). The version of § 104(a)(2) in effect prior to 1996 had excluded from gross income monies received in compensation for "personal injuries or sickness," which included both physical and nonphysical injuries such as emotional distress. *Id.* § 104(a)(2) (1995); *see United States v.*

*Burke*, 504 U.S. 229, 235 n.6 (1992) ("[section] 104(a)(2) in fact encompasses a broad range of physical and nonphysical injuries to personal interests"). In *Commissioner v. Schleier*, 515 U.S. 323 (1995), the Supreme Court held that before a taxpayer may exclude compensatory damages from gross income pursuant to § 104(a)(2), he must first demonstrate that "the underlying cause of action giving rise to the recovery [was] 'based upon tort or tort type rights.'" *Id.* at 337. The taxpayer has the same burden under the statute as amended. *See, e.g.*, *Chamberlain v. United States*, 401 F.3d 335, 341 (5th Cir. 2005).

Murphy contends § 104(a)(2), even as amended, excludes her particular award from gross income. First, she asserts her award was "based upon ... tort type rights" in the whistle-blower statutes the NYANG violated — a position the Government does not challenge. Second, she claims she was compensated for "physical" injuries, which claim the Government does dispute.

Murphy points both to her psychologist's testimony that she had experienced "somatic" and "body" injuries "as a result of NYANG's blacklisting [her]," and to the American Heritage Dictionary, which defines "somatic" as "relating to, or affecting the body, especially as distinguished from a body part, the mind, or the environment." Murphy further argues the dental records she submitted to the IRS proved she has suffered permanent damage to her teeth. Citing *Walters v. Mintec/International*, 758 F.2d 73, 78 (3d Cir. 1985), and *Payne v. Gen. Motors Corp.*, 731 F. Supp. 1465, 1474-75 (D. Kan. 1990), Murphy contends that "substantial physical problems caused by emotional distress are considered physical injuries or physical sickness."

Murphy further contends that neither § 104 of the IRC nor the regulation issued thereunder "limits the physical disability exclusion to a physical stimulus." In fact, as Murphy points out, the applicable regulation, which provides that § 104(a)(2)

"excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness," 26 C.F.R. § 1.104-1(c), does not distinguish between physical injuries stemming from physical stimuli and those arising from emotional trauma; rather, it tracks the pre-1996 text of § 104(a)(2), which the IRS agrees excluded from gross income compensation both for physical and for nonphysical injuries.

For its part, the Government argues Murphy's focus upon the word "physical" in § 104(a)(2) is misplaced; more important is the phrase "on account of." In *O'Gilvie v. United States*, 519 U.S. 79 (1996), the Supreme Court read that phrase to require a "strong[] causal connection," thereby making § 104(a)(2) "applicable only to those personal injury lawsuit damages that were awarded by reason of, or because of, the personal injuries." *Id.* at 83. The Court specifically rejected a "but-for" formulation in favor of a "stronger causal connection." *Id.* at 82-83. The Government therefore concludes Murphy must demonstrate she was awarded damages "because of" her physical injuries, which the Government claims she has failed to do.

Indeed, as the Government points out, the ALJ expressly recommended, and the Board expressly awarded, compensatory damages "because of" Murphy's nonphysical injuries. The Board analyzed the ALJ's recommendation under the headings "Compensatory damage for emotional distress or mental anguish" and "Compensatory damage award for injury to professional reputation," and noted such damages compensate "not only for direct pecuniary loss, but also for such harms as impairment of reputation, personal humiliation, and mental anguish and suffering." *Leveille*, 1999 WL 966951 at *2. In describing the ALJ's proposed award as "reasonable," the Board stated Murphy was to receive "$45,000 for mental pain and anguish" and "$25,000 for injury to professional reputation."

Although Murphy may have suffered from bruxism or other physical symptoms of stress, the Board focused upon Murphy's testimony that she experienced "severe anxiety attacks, inability to concentrate, a feeling that she no longer enjoyed 'anything in life,' and marital conflict" and upon her psychologist's testimony about the "substantial effect the negative references had on [Murphy]." *Id.* at *3. The Board made no reference to her bruxism, and acknowledged that "[a]ny attempt to set a monetary value on intangible damages such as mental pain and anguish involves a subjective judgment," *id.* at *4, before concluding the ALJ's recommendation was reasonable. The Government therefore argues "there was no direct causal link between the damages award at issue and [Murphy's] bruxism."

Murphy responds that it is undisputed she suffered both "somatic" and "emotional" injuries, and the ALJ and Board expressly cited to the portion of her psychologist's testimony establishing that fact. She contends the Board therefore relied upon her physical injuries in determining her damages, making those injuries a direct cause of her award in spite of the Board's labeling the award as one for emotional distress.

Although the pre-1996 version of § 104(a)(2) was at issue in *O'Gilvie*, the Court's analysis of the phrase "on account of," which phrase was unchanged by the 1996 Amendments, remains controlling here. Murphy no doubt suffered from certain physical manifestations of emotional distress, but the record clearly indicates the Board awarded her compensation only "for mental pain and anguish" and "for injury to professional reputation." *Id.* at *5. Although the Board cited her psychologist, who had mentioned her physical aliments, in support of Murphy's "description of her mental anguish," we cannot say the Board, notwithstanding its clear statements to the contrary, actually awarded damages because of Murphy's bruxism and other physical manifestations of stress. *Id.* at *3.

At best — and this is doubtful — at best the Board and the ALJ may have considered her physical injuries indicative of the severity of the emotional distress for which the damages were awarded, but her physical injuries themselves were not the reason for the award. The Board thus having left no room for doubt about the grounds for her award, we conclude Murphy's damages were not "awarded by reason of, or because of, ... [physical] personal injuries," *O'Gilvie*, 519 U.S. at 83. Therefore, § 104(a)(2) does not permit Murphy to exclude her award from gross income.[*]

C.  Section 61 of the IRC

Murphy and the Government agree that for Murphy's award to be taxable, it must be part of her "gross income" as defined by § 61(a) of the IRC, which states in relevant part: "gross income means all income from whatever source derived." The Supreme Court has interpreted the section broadly to extend to "all economic gains not otherwise exempted." *Comm'r v. Banks*, 543 U.S. 426, 433 (2005); *see also, e.g.*, *James v. United States*, 366 U.S. 213, 219 (1961) (Section 61 encompasses "all accessions to wealth") (internal quotation mark omitted); *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430 ("the Court has given a liberal construction to ["gross income"] in recognition of the intention of Congress to tax all gains except those specifically exempted"). "Gross income" in § 61(a) is at least as broad as the meaning of "incomes" in the Sixteenth

---

[*] Insofar as compensation for nonphysical personal injuries appears to be excludable from gross income under 26 C.F.R. § 1.104-1, the regulation conflicts with the plain text of § 104(a)(2); in these circumstances the statute clearly controls. *See Brown v. Gardner*, 513 U.S. 115, 122 (1994) (finding "no antidote to [a regulation's] clear inconsistency with a statute").

Amendment.[*] *See Glenshaw Glass*, 348 U.S. at 429, 432 n.11 (quoting H.R. Rep. No. 83-1337, at A18 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4155); *Helvering v. Bruun*, 309 U.S. 461, 468 (1940).

Murphy argues her award is not a gain or an accession to wealth and therefore not part of gross income. Noting the Supreme Court has long recognized "the principle that a restoration of capital [i]s not income; hence it [falls] outside the definition of 'income' upon which the law impose[s] a tax," *O'Gilvie*, 519 U.S. at 84; *see, e.g.*, *Doyle v. Mitchell Bros. Co.*, 247 U.S. 179, 187-88 (1918); *S. Pac. Co. v. Lowe*, 247 U.S. 330, 335 (1918), Murphy contends a damage award for personal injuries — including nonphysical injuries — should be viewed as a return of a particular form of capital — "human capital," as it were. *See* Gary S. Becker, HUMAN CAPITAL (1st ed. 1964); Gary S. Becker, The Economic Way of Looking at Life, Nobel Lecture (Dec. 9, 1992), *in* NOBEL LECTURES IN ECONOMIC SCIENCES 1991-1995, at 43-45 (Torsten Persson ed., 1997). In her view, the Supreme Court in *Glenshaw Glass* acknowledged the relevance of the human capital concept for tax purposes. There, in holding that punitive damages for personal injury were "gross income" under the predecessor to § 61, the Court stated:

> The long history of ... holding personal injury recoveries nontaxable on the theory that they roughly correspond to a return of capital cannot support exemption of punitive damages following injury to property .... Damages for personal injury are by definition compensatory only. Punitive damages, on

---

[*] The Sixteenth Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

the other hand, cannot be considered a restoration of capital for taxation purposes.

348 U.S. at 432 n.8. By implication, Murphy argues, damages for personal injury are a "restoration of capital."

As further support, Murphy cites various administrative rulings issued shortly after passage of the Sixteenth Amendment that concluded recoveries from personal injuries were not income, such as this 1918 Opinion of the Attorney General:

> Without affirming that the human body is in a technical sense the "capital" invested in an accident policy, in a broad, natural sense the proceeds of the policy do but substitute, so far as they go, capital which is the source of future periodical income. They merely take the place of capital in human ability which was destroyed by the accident. They are therefore "capital" as distinguished from "income" receipts.

31 Op. Att'y Gen. 304, 308; *see* T.D. 2747, 20 Treas. Dec. Int. Rev. 457 (1918); Sol. Op. 132, I-1 C.B. 92, 93-94 (1922) ("[M]oney received ... on account of ... defamation of personal character ... does not constitute income within the meaning of the sixteenth amendment and the statutes enacted thereunder"). She also cites a House Report on the bill that became the Revenue Act of 1918. H.R. Rep. No. 65-767, at 9-10 (1918) ("Under the present law it is doubtful whether amounts received ... as compensation for personal injury ... are required to be included in gross income"); *see also Dotson v. United States*, 87 F.3d 682, 685 (5th Cir. 1996) (concluding on basis of House Report that the "Congress first enacted the personal injury compensation exclusion ... when such payments were considered the return of human capital, and thus not constitutionally taxable 'income' under the 16th amendment").

Finally, Murphy argues her interpretation of § 61 is reflected in the common law of tort and the provisions in various environmental statutes and Title VII of the Civil Rights Act of 1964, all of which provide for "make whole" relief. *See, e.g.*, 42 U.S.C. § 1981a; 15 U.S.C. § 2622. If a recovery of damages designed to "make whole" the plaintiff is taxable, she reasons, then one who receives the award has not been made whole after tax. Section 61 should not be read to create a conflict between the tax code and the "make whole" purpose of the various statutes.

The Government disputes Murphy's interpretation on all fronts. First, noting "the definition [of gross income in the IRC] extends broadly to all economic gains," *Banks*, 543 U.S. at 433, the Government asserts Murphy "undeniably had economic gain because she was better off financially after receiving the damages award than she was prior to receiving it." Second, the Government argues that the case law Murphy cites does not support the proposition that the Congress lacks the power to tax as income recoveries for personal injuries. In its view, to the extent the Supreme Court has addressed at all the taxability of compensatory damages, *see, e.g.*, *O'Gilvie*, 519 U.S. at 86; *Glenshaw Glass*, 348 U.S. at 432 n.8, it was merely articulating the Congress's rationale at the time for not taxing such damages, not the Court's own view whether such damages could constitutionally be taxed.

Third, the Government challenges the relevance of the administrative rulings Murphy cites from around the time the Sixteenth Amendment was ratified; Treasury decisions dating from even closer to the time of ratification treated damages received on account of personal injury as income. *See* T.D. 2135, 17 Treas. Dec. Int. Rev. 39, 42 (1915); T.D. 2690, Reg. No. 33 (Rev.), art. 4, 20 Treas. Dec. Int. Rev. 126, 130 (1918). Furthermore, administrative rulings from the time suggest that,

even if recoveries for physical personal injuries were not considered part of income, recoveries for nonphysical personal injuries were. *See* Sol. Mem. 957, 1 C.B. 65 (1919) (damages for libel subject to income tax); Sol. Mem. 1384, 2 C.B. 71 (1920) (recovery of damages from alienation of wife's affections not regarded as return of capital, hence taxable). Although the Treasury changed its position in 1922, *see* Sol. Op. 132, I-1 C.B. at 93-94, it did so only after the Supreme Court's decision in *Eisner v. Macomber*, 252 U.S. 189 (1920), which the Court later viewed as having established a definition of income that "served a useful purpose [but] was not meant to provide a touchstone to all future gross income questions." *Glenshaw Glass*, 348 U.S. at 430-31. As for Murphy's contention that reading § 61 to include her damages would be in tension with the common law and various statutes providing for "make whole" relief, the Government denies there is any tension and suggests Murphy is trying to turn a disagreement over tax policy into a constitutional issue.

Finally, the Government argues that even if the concept of human capital is built into § 61, Murphy's award is nonetheless taxable because Murphy has no tax basis in her human capital. Under the IRC, a taxpayer's gain upon the disposition of property is the difference between the "amount realized" from the disposition and his basis in the property, 26 U.S.C. § 1001, defined as "the cost of such property," *id.* § 1012, adjusted "for expenditures, receipts, losses, or other items, properly chargeable to [a] capital account," *id.* § 1016(a)(1). The Government asserts, "The Code does not allow individuals to claim a basis in their human capital"; accordingly, Murphy's gain is the full value of the award. *See Roemer v. Comm'r*, 716 F.2d 693, 696 n.2 (9th Cir. 1983) ("Since there is no tax basis in a person's health and other personal interests, money received as compensation for an injury to those interests might be considered a realized accession to wealth") (dictum).

Although Murphy and the Government focus primarily upon whether Murphy's award falls within the definition of income first used in *Glenshaw Glass*,[*] coming within that definition is not the only way in which § 61(a) could be held to encompass her award. Principles of statutory interpretation could show § 61(a) includes Murphy's award in her gross income regardless whether it was an "accession to wealth," as *Glenshaw Glass* requires. For example, if § 61(a) were amended specifically to include in gross income "$100,000 in addition to all other gross income," then that additional sum would be a part of gross income under § 61 even though no actual gain was associated with it. In other words, although the "Congress cannot make a thing income which is not so in fact," *Burk-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 114 (1925), it can *label* a thing income and tax it, so long as it acts within its constitutional authority, which includes not only the Sixteenth Amendment but also Article I, Sections 8 and 9. *See Penn Mut. Indem. Co. v. Comm'r*, 277 F.2d 16, 20 (3d Cir. 1960) ("Congress has the power to impose taxes generally, and if the particular imposition does not run afoul of any constitutional restrictions then the tax is lawful, call it what you will") (footnote omitted). Accordingly, rather than ask whether Murphy's award was an accession to her wealth, we go to the heart of the matter, which is whether her award is properly

---

[*] Murphy also suggests further insight into whether her award is income can be gleaned from application of the "in lieu of" test. *See Raytheon Prod. Corp. v. Comm'r*, 144 F.2d 110, 113 (1st Cir. 1944). As she acknowledges, however, we would still be required to determine whether her award was compensatory or an accession to wealth, which is the same analysis *Glenshaw Glass* and its progeny demand. As discussed below, it is unnecessary to determine if there was an accession to wealth in this case; § 61 encompasses Murphy's award regardless.

included within the definition of gross income in § 61(a), to wit, "all income from whatever source derived."

Looking at § 61(a) by itself, one sees no indication that it covers Murphy's award unless the award is "income" as defined by *Glenshaw Glass* and later cases. Damages received for emotional distress are not listed among the examples of income in § 61 and, as Murphy points out, an ambiguity in the meaning of a revenue-raising statute should be resolved in favor of the taxpayer. *See, e.g.*, *Hassett v. Welch*, 303 U.S. 303, 314 (1938); *Gould v. Gould*, 245 U.S. 151, 153 (1917); *see also United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 839 (2001) (Thomas, J., concurring); *id.* at 839 n.1 (Stevens, J., dissenting); 3A NORMAN J. SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 66:1 (6th ed. 2003). A statute is to be read as a whole, however, *see, e.g.*, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004), and reading § 61 in combination with § 104(a)(2) of the Internal Revenue Code presents a very different picture — a picture so clear that we have no occasion to apply the canon favoring the interpretation of ambiguous revenue-raising statutes in favor of the taxpayer.

As noted above, in 1996 the Congress amended § 104(a) to narrow the exclusion to amounts received on account of "personal physical injuries or physical sickness" from "personal injuries or sickness," and explicitly to provide that "emotional distress shall not be treated as a physical injury or physical sickness," thus making clear that an award received on account of emotional distress is not excluded from gross income under § 104(a)(2). Small Business Job Protection Act of 1996, Pub. L. 104-188, § 1605, 110 Stat. 1755, 1838. As this amendment, which narrows the exclusion, would have no effect whatsoever if such damages were not included within the ambit of § 61, and as we must presume that "[w]hen Congress acts to amend a statute, ... it intends its amendment to have real and substantial

18

effect," *Stone v. INS*, 514 U.S. 386, 397 (1995), the 1996 amendment of § 104(a) strongly suggests § 61 should be read to include an award for damages from nonphysical harms.[*] Although it is unclear whether § 61 covered such an award before 1996, we need not address that question here; even if the provision did not do so prior to 1996, the presumption indicates the Congress implicitly amended § 61 to cover such an award when it amended § 104(a).

We realize, of course, that amendments by implication, like repeals by implication, are disfavored. *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964); *Cheney R.R. Co. v. R.R. Ret. Bd.*, 50 F.3d 1071, 1078 (D.C. Cir. 1995). The Supreme Court has also noted, however, that the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand"); *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (suggesting later enacted laws "depend[ing] for their effectiveness upon clarification, or a change in the meaning of an earlier statute" provide a "forward looking legislative mandate, guidance, or direct suggestion about how courts should interpret the earlier

---

[*] As evidence the presumption is well-founded in this case, we note the House Report accompanying the 1996 amendment to § 104 explicitly presumes recoveries for nonphysical injuries would be included in gross income: Part of the section explaining the effect of the amendment is entitled "Include in income damage recoveries for nonphysical injuries." H.R. Rep. No. 104-586, at 143-44 (1996), *reprinted in* 1996-3 C.B. 331, 481-82.

provisions"); *cf. Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 72-73 (1992) (amendment of Title IX abrogating States' Eleventh Amendment immunity validated Court's prior holding that Title IX created implied right of action); *id.* at 78 (Scalia, J., concurring in judgment) (amendment to Title IX was an "implicit acknowledgment that damages are available").

This "classic judicial task" is before us now. For the 1996 amendment of § 104(a) to "make sense," gross income in § 61(a) must, and we therefore hold it does, include an award for nonphysical damages such as Murphy received, regardless whether the award is an accession to wealth. *Cf. Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 786 & n.17 (2000) (determining meaning of "person" in False Claims Act, which was originally enacted in 1863, based in part upon definition of "person" in Program Fraud Civil Remedies Act of 1986, which was "designed to operate in tandem with the [earlier Act]").

D.  The Congress's Power to Tax

The taxing power of the Congress is established by Article I, Section 8 of the Constitution: "The Congress shall have power to lay and collect taxes, duties, imposts and excises." There are two limitations on this power. First, as the same section goes on to provide, "all duties, imposts and excises shall be uniform throughout the United States." Second, as provided in Section 9 of that same Article, "No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken." *See also* U.S. CONST. art. I, § 2, cl. 3 ("direct taxes shall be apportioned among the several states which may be included within this union, according to their

respective numbers").[*] We now consider whether the tax laid upon Murphy's award violates either of these two constraints.

1. A Direct Tax?

Over the years, courts have considered numerous claims that one or another nonapportioned tax is a direct tax and therefore unconstitutional. Although these cases have not definitively marked the boundary between taxes that must be apportioned and taxes that need not be, *see Bromley v. McCaughn*, 280 U.S. 124, 136 (1929); *Spreckels Sugar Ref. Co. v. McClain*, 192 U.S. 397, 413 (1904) (dividing line between "taxes that are direct and those which are to be regarded simply as excises" is "often very difficult to be expressed in words"), some characteristics of each may be discerned.

Only three taxes are definitely known to be direct: (1) a capitation, U.S. CONST. art. I, § 9, (2) a tax upon real property, and (3) a tax upon personal property. *See Fernandez v. Wiener*, 326 U.S. 340, 352 (1945) ("Congress may tax real estate or chattels if the tax is apportioned"); *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 637 (1895) (*Pollock II*).[**] Such direct taxes are laid upon one's "general ownership of property," *Bromley*, 280 U.S. at 136; *see also Flint v. Stone Tracy Co.*, 220 U.S. 107, 149 (1911), as contrasted with excise taxes laid "upon

---

[*] Though it is unclear whether an income tax is a direct tax, the Sixteenth Amendment definitively establishes that a tax upon income is not required to be apportioned. *See Stanton v. Baltic Mining Co.*, 240 U.S. 103, 112-13 (1916).

[**] *Pollock II* also held that a tax upon the income of real or personal property is a direct tax. 158 U.S. at 637. Whether that portion of *Pollock* remains good law is unclear. *See Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 480 (1939).

a particular use or enjoyment of property or the shifting from one to another of any power or privilege incidental to the ownership or enjoyment of property." *Fernandez*, 326 U.S. at 352; *see also Thomas v. United States*, 192 U.S. 363, 370 (1904) (excises cover "duties imposed on importation, consumption, manufacture and sale of certain commodities, privileges, particular business transactions, vocations, occupations and the like"). More specifically, excise taxes include, in addition to taxes upon consumable items, *see Patton v. Brady*, 184 U.S. 608, 617-18 (1902), taxes upon the sale of grain on an exchange, *Nicol v. Ames*, 173 U.S. 509, 519 (1899), the sale of corporate stock, *Thomas*, 192 U.S. at 371, doing business in corporate form, *Flint*, 220 U.S. at 151, gross receipts from the "business of refining sugar," *Spreckels*, 192 U.S. at 411, the transfer of property at death, *Knowlton v. Moore*, 178 U.S. 41, 81-82 (1900), gifts, *Bromley*, 280 U.S. at 138, and income from employment, *see Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 579 (1895) (*Pollock I*) (citing *Springer v. United States*, 102 U.S. 586 (1881)).

Murphy and the amici supporting her argue the dividing line between direct and indirect taxes is based upon the ultimate incidence of the tax; if the tax cannot be shifted to someone else, as a capitation cannot, then it is a direct tax; but if the burden can be passed along through a higher price, as a sales tax upon a consumable good can be, then the tax is indirect. This, she argues, was the distinction drawn when the Constitution was ratified. *See* Albert Gallatin, A Sketch of the Finances of the United States (1796), *reprinted in* 3 THE WRITINGS OF ALBERT GALLATIN 74-75 (Henry Adams ed., Philadelphia, J.P. Lippincott & Co. 1879) ("The most generally received opinion ... is, that by direct taxes ... those are meant which are raised on the capital or revenue of the people; by indirect, such as are raised on their expense"); THE FEDERALIST NO. 36, at 225 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("internal

taxes[] may be subdivided into those of the *direct* and those of the *indirect* kind ... by which must be understood duties and excises on articles of consumption"). *But see* Gallatin, *supra*, at 74 ("[Direct tax] is used, by different writers, and even by the same writers, in different parts of their writings, in a variety of senses, according to that view of the subject they were taking"); EDWIN R.A. SELIGMAN, THE INCOME TAX 540 (photo. reprint 1970) (2d ed. 1914) ("there are almost as many classifications of direct and indirect taxes are there are authors"). Moreover, the amici argue, this understanding of the distinction explains the different restrictions imposed respectively upon the power of the Congress to tax directly (apportionment) and via excise (uniformity). Duties, imposts, and excise taxes, which were expected to constitute the bulk of the new federal government's revenue, *see* Erik M. Jensen, *The Apportionment of "Direct Taxes": Are Consumption Taxes Constitutional?*, 97 COLUM. L. REV. 2334, 2382 (1997), have a built-in safeguard against oppressively high rates: Higher taxes result in higher prices and therefore fewer sales and ultimately lower tax revenues. *See* THE FEDERALIST NO. 21, *supra*, at 134-35 (Alexander Hamilton). Taxes that cannot be shifted, in contrast, lack this self-regulating feature, and were therefore constrained by the more stringent requirement of apportionment. *See id.* at 135 ("In a branch of taxation where no limits to the discretion of the government are to be found in the nature of things, the establishment of a fixed rule ... may be attended with fewer inconveniences than to leave that discretion altogether at large"); *see also* Jensen, *supra*, at 2382-84.

Finally, the amici contend their understanding of a direct tax was confirmed in *Pollock II*, where the Supreme Court noted that "the words 'duties, imposts, and excises' are put in antithesis to direct taxes," 158 U.S. at 622, for which it cited THE FEDERALIST NO. 36 (Hamilton). *Pollock II*, 158 U.S. at 624-25. As it is clear that Murphy cannot shift her tax burden

to anyone else, per Murphy and the amici, it must be a direct tax.

The Government, unsurprisingly, backs a different approach; by its lights, only "taxes that are capable of apportionment in the first instance, specifically, capitation taxes and taxes on land," are direct taxes. The Government maintains that this is how the term was generally understood at the time. *See* Calvin H. Johnson, *Fixing the Constitutional Absurdity of the Apportionment of Direct Tax*, 21 CONST. COMM. 295, 314 (2004). Moreover, it suggests, this understanding is more in line with the underlying purpose of the tax and the apportionment clauses, which were drafted in the intense light of experience under the Articles of Confederation.

The Articles did not grant the Continental Congress the power to raise revenue directly; it could only requisition funds from the States. *See* ARTICLES OF CONFEDERATION art. VIII (1781); Bruce Ackerman, *Taxation and the Constitution*, 99 COLUM. L. REV. 1, 6-7 (1999). This led to problems when the States, as they often did, refused to remit funds. *See* Calvin H. Johnson, *The Constitutional Meaning of "Apportionment of Direct Taxes,"* 80 TAX NOTES 591, 593-94 (1998). The Constitution redressed this problem by giving the new national government plenary taxing power. *See* Ackerman, *supra*, at 7. In the Government's view, it therefore makes no sense to treat "direct taxes" as encompassing taxes for which apportionment is effectively impossible, because "the Framers could not have intended to give Congress plenary taxing power, on the one hand, and then so limit that power by requiring apportionment for a broad category of taxes, on the other." This view is, according to the Government, buttressed by evidence that the purpose of the apportionment clauses was not in fact to constrain the power to tax, but rather to placate opponents of the compromise over representation of the slave states in the House,

as embodied in the Three-fifths Clause.[*] *See* Ackerman, *supra*, at 10-11. *See generally* SELIGMAN, *supra*, at 548-55. As the Government interprets the historical record, the apportionment limitation was "more symbolic than anything else: it appeased the anti-slavery sentiment of the North and offered a practical advantage to the South as long as the scope of direct taxes was limited." *See* Ackerman, *supra*, at 10. *But see* Erik M. Jensen, *Taxation and the Constitution: How to Read the Direct Tax Clauses*, 15 J.L. & POL. 687, 704 (1999) ("One of the reasons [the direct tax restriction] worked as a compromise was that it had teeth — it made direct taxes difficult to impose — and it had teeth however slaves were counted").

The Government's view of the clauses is further supported by the near contemporaneous decision of the Supreme Court in *Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796), holding that a national tax upon carriages was not a direct tax, and thus not subject to apportionment. Justices Chase and Iredell opined that a "direct tax" was one that, unlike the carriage tax, as a practical matter could be apportioned among the States, *id.* at 174 (Chase, J.); *id.* at 181 (Iredell, J.), while Justice Paterson, noting the connection between apportionment and slavery, condemned apportionment as "radically wrong" and "not to be extended by

---

[*] Many Northern delegates were opposed to the three-fifths compromise on the ground that if slaves were property, then they should not count for the purpose of representation. Apportionment effectively meant that if the slaveholding states were to receive representation in the House for their slaves, then because apportioned taxes must be allocated across states based upon their representation, the slaveholding states would pay more in taxes to the national government than they would have if slaves were not counted at all in determining representation. *See* Ackerman, *supra*, at 9. Apportionment was then limited to direct taxes lest it drive the Congress back to reliance upon requisitions from the States. *See id.* at 9-10.

25

construction," *id.* at 177-78.[*]  As for Murphy's reliance upon *Pollock II*, the Government contends that although it has never been overruled, "every aspect of its reasoning has been eroded," *see, e.g.*, *Stanton v. Baltic Mining Co.*, 240 U.S. 103, 112-13 (1916), and notes that in *Pollock II* itself the Court acknowledged that "taxation on business, privileges, or employments has assumed the guise of an excise tax," 158 U.S. at 635.  *Pollock II*, in the Government's view, is therefore too weak a reed to support Murphy's broad definition of "direct tax" and certainly does not make "a tax on the conversion of human capital into money ... problematic."

Murphy replies that the Government's historical analysis does not respond to the contemporaneous sources she and the amici identified showing that taxes imposed upon individuals are direct taxes.  As for *Hylton*, Murphy argues nothing in that decision precludes her position; the Justices viewed the carriage tax there at issue as a tax upon an expense, *see* 3 U.S. (3 Dall.) at 175 (Chase, J.); *see also id.* at 180-81 (Paterson, J.), which she agrees is not a direct tax.  *See Pollock II*, 158 U.S. at 626-27. To the extent *Hylton* is inconsistent with her position, however, Murphy contends her references to the Federalist are more authoritative evidence of the Framers' understanding of the term.

Murphy makes no attempt to reconcile her definition with the long line of cases identifying various taxes as excise taxes, although several of them seem to refute her position directly.  In particular, we do not see how a known excise, such as the estate tax, *see, e.g.*, *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921); *Knowlton*, 178 U.S. at 81-83, or a tax upon income from

---

[*] The other Justice to hear the case, Wilson, J., had previously determined while sitting on the Circuit Court of Virginia, that the tax was not direct and so he did not write a full opinion. *Id.* at 183-84.

employment, *see Pollock II*, 158 U.S. at 635; *Pollock I*, 157 U.S. at 579; *cf. Steward Mach. Co. v. Davis*, 301 U.S. 548, 580-81 (1937) (tax upon employers based upon wages paid to employees is an excise), can be shifted to another person, absent which they seem to be in irreconcilable conflict with her position that a tax that cannot be shifted to someone else is a direct tax. Though it could be argued that the incidence of an estate tax is inevitably shifted to the beneficiaries, we see at work none of the restraint upon excessive taxation that Murphy claims such shifting is supposed to provide; the tax is triggered by an event, death, that cannot be shifted or avoided. In any event, *Knowlton* addressed the argument that *Pollock I* and *II* made ability to shift the hallmark of a direct tax, and rejected it. 178 U.S. at 81-82. Regardless what the original understanding may have been, therefore, we are bound to follow the Supreme Court, which has strongly intimated that Murphy's position is not the law.

That said, neither need we adopt the Government's position that direct taxes are only those capable of satisfying the constraint of apportionment. In the abstract, such a constraint is no constraint at all; virtually any tax may be apportioned by establishing different rates in different states. *See Pollock II*, 158 U.S. at 632-33. If the Government's position is instead that by "capable of apportionment" it means "capable of apportionment in a manner that does not unfairly tax some individuals more than others," then it is difficult to see how a land tax, which is widely understood to be a direct tax, could be apportioned by population without similarly imposing significantly non-uniform rates. *See Hylton*, 3 U.S. (3 Dall.) at 178-79 (Paterson, J.); Johnson, *Constitutional Absurdity*, *supra*, at 328. *But see, e.g.*, *Hylton*, 3 U.S. (3 Dall.) at 183 (Iredell, J.) (contending land tax is capable of apportionment).

We find it more appropriate to analyze this case based upon the precedents and therefore to ask whether the tax laid upon Murphy's award is more akin, on the one hand, to a capitation or a tax upon one's ownership of property, or, on the other hand, more like a tax upon a use of property, a privilege, an activity, or a transaction, *see Thomas*, 192 U.S. at 370. Even if we assume one's human capital should be treated as personal property, it does not appear that this tax is upon ownership; rather, as the Government points out, Murphy is taxed only after she receives a compensatory award, which makes the tax seem to be laid upon a transaction. *See Tyler v. United States*, 281 U.S. 497, 502 (1930) ("A tax laid upon the happening of an event, as distinguished from its tangible fruits, is an indirect tax which Congress, in respect of some events ... undoubtedly may impose"); *Simmons v. United States*, 308 F.2d 160, 166 (4th Cir. 1962) (tax upon receipt of money is not a direct tax); *cf. Penn Mut.*, 277 F.2d at 20. Murphy's situation seems akin to an involuntary conversion of assets; she was forced to surrender some part of her mental health and reputation in return for monetary damages. *Cf.* 26 U.S.C. § 1033 (property involuntarily converted into money is taxed to extent of gain recognized).

At oral argument Murphy resisted this formulation on the ground that the receipt of an award in lieu of lost mental health or reputation is not a transaction. This view is tenable, however, only if one decouples Murphy's injury (emotional distress and lost reputation) from her monetary award, but that is not beneficial to Murphy's cause, for then Murphy has nothing to offset the obvious accession to her wealth, which is taxable as income. Murphy also suggested at oral argument that there was no transaction because she did not profit. Whether she profited is irrelevant, however, to whether a tax upon an award of damages is a direct tax requiring apportionment; profit is relevant only to whether, if it is a direct tax, it nevertheless need

not be apportioned because the object of the tax is income within the meaning of the Sixteenth Amendment. *Cf. Spreckels*, 192 U.S. at 412-13 (tax upon gross receipts associated with business of refining sugar not a direct tax); *Penn Mut.*, 277 F.2d at 20 (tax upon gross receipts deemed valid indirect tax despite taxpayer's net loss).

So we return to the question:  Is a tax upon this particular kind of transaction equivalent to a tax upon a person or his property?  *Cf. Bromley*, 280 U.S. at 138 (assuming without deciding that a tax "levied upon all the uses to which property may be put, or upon the exercise of a single power indispensable to the enjoyment of all others over it, would be in effect a tax upon property").  Murphy did not receive her damages pursuant to a business activity, *cf. Flint*, 220 U.S. at 151; *Spreckels*, 192 U.S. at 411, and we therefore do not view this tax as an excise under that theory. *See Stratton's Independence, Ltd. v. Howbert*, 231 U.S. 399, 414-15 (1913) ("The sale outright of a mining property might be fairly described as a mere conversion of the capital from land into money").  On the other hand, as noted above, the Supreme Court several times has held a tax not related to business activity is nonetheless an excise.  And the tax at issue here is similar to those.

*Bromley*, in which a gift tax was deemed an excise, is particularly instructive:  The Court noted it was "a tax laid only upon the exercise of a single one of those powers incident to ownership," 280 U.S. at 136, which distinguished it from "a tax which falls upon the owner merely because he is owner, regardless of the use or disposition made of his property," *id.* at 137.  A gift is the functional equivalent of a below-market sale; it therefore stands to reason that if, as *Bromley* holds, a gift tax, or a tax upon a below-market sale, is a tax laid not upon ownership but upon the exercise of a power "incident to ownership," then a tax upon the sale of property at fair market

value is similarly laid upon an incidental power and not upon ownership, and hence is an excise. Therefore, even if we were to accept Murphy's argument that the human capital concept is reflected in the Sixteenth Amendment, a tax upon the involuntary conversion of that capital would still be an excise and not subject to the requirement of apportionment. *But see Nicol*, 173 U.S. at 521 (indicating pre-*Bromley* that tax upon "every sale made in any place ... is really and practically upon property").

In any event, even if a tax upon the sale of property is a direct tax upon the property itself, we do not believe Murphy's situation involves a tax "upon the sale itself, considered separate and apart from the place and the circumstances of the sale." *Id.* at 520. Instead, as in *Nicol*, this tax is more akin to "a duty upon the facilities made use of and actually employed in the transaction." *Id.* at 519. To be sure, the facility used in *Nicol* was a commodities exchange whereas the facility used by Murphy was the legal system, but that hardly seems a significant distinction. The tax may be laid upon the proceeds received when one vindicates a statutory right, but the right is nonetheless a "creature of law," which *Knowlton* identifies as a "privilege" taxable by excise. 178 U.S. at 55 (right to take property by inheritance is granted by law and therefore taxable as upon a privilege);[*] *cf. Steward*, 301 U.S. at 580-81 ("[N]atural rights, so called, are as much subject to taxation as rights of less importance. An excise is not limited to vocations or activities that may be prohibited altogether. ... It extends to vocations or activities pursued as of common right.") (footnote omitted).

2. Uniformity

---

[*] For the same reason, we infer from *Knowlton* that a tax laid upon an amount received in settlement of a suit for a personal nonphysical injury would also be an excise. *See* 178 U.S. at 55.

The Congress may not implement an excise tax that is not "uniform throughout the United States." U.S. CONST. art. I, § 8, cl. 1. A "tax is uniform when it operates with the same force and effect in every place where the subject of it is found." *United States v. Ptasynski*, 462 U.S. 74, 82 (1983) (internal quotation marks omitted); *see also Knowlton*, 178 U.S. at 84-86, 106. The tax laid upon an award of damages for a nonphysical personal injury operates with "the same force and effect" throughout the United States and therefore satisfies the requirement of uniformity.

## III. Conclusion

For the foregoing reasons, we conclude (1) Murphy's compensatory award was not received on account of personal physical injuries, and therefore is not exempt from taxation pursuant to § 104(a)(2) of the IRC; (2) the award is part of her "gross income," as defined by § 61 of the IRC; and (3) the tax upon the award is an excise and not a direct tax subject to the apportionment requirement of Article I, Section 9 of the Constitution. The tax is uniform throughout the United States and therefore passes constitutional muster. The judgment of the district court is accordingly

*Affirmed.*