# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 5, 2018     Decided August 14, 2018

No. 17-1025

GREEN GAS DELAWARE STATUTORY TRUST,
METHANE BIO, LLC, TAX MATTERS PARTNER, ET AL.,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

Consolidated with 17-1026, 17-1027

On Appeals from the Decisions
of the United States Tax Court

*Robert J. Kovacev* argued the cause for appellants. With him on the briefs was *Caitlin R. Tharp*.

*Jennifer M. Rubin*, Attorney, U.S. Department of Justice, argued the cause for federal appellee. With her on the brief was *Bruce R. Ellisen*, Attorney.

Before: GARLAND, *Chief Judge*, and TATEL and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Rumpelstiltskin could spin straw into gold. Rumpelstiltskin, Inc. thought it could do the same for garbage, spinning it into tax credits. The Commissioner of the Internal Revenue Service disagreed. So did the Tax Court. So do we.

I

Every year, Americans generate 250 million tons of garbage. EPA, MUNICIPAL WASTE FACT SHEET 1 (2012), perma.cc/DQD3-YK9C. Slightly over half of that garbage is deposited in landfills, where it is left to decompose. *Id.* at 2. The decomposition of organic matter in those landfills produces a gas -- appropriately termed "landfill gas" -- that contains roughly 50-55% methane, 45-50% carbon dioxide, small amounts of non-methane organic compounds, and trace amounts of inorganic compounds. *See* Stipulation of Facts ¶ 56 (App. 369). Landfill gas is both a potential environmental hazard and a potential energy source.

During the time relevant to this case, Rumpelstiltskin, Inc. was the parent of a wholly-owned subsidiary, Resource Technology Corporation (RTC). *See Green Gas Del. Statutory Tr. v. Comm'r*, 147 T.C. 1, 4 (2016). RTC was founded in 1993 and, by 1997, had entered into agreements with 24 landfills throughout the United States. Each agreement transferred to RTC the rights to develop and construct a landfill gas-collection facility and to produce and sell electricity from landfill gas. In return, RTC agreed to pay the landfill owners royalties, measured as a percentage of electricity sales. *See Green Gas*, 147 T.C. at 9; Stipulation of Facts ¶ 52 (App. 368).

RTC also entered into agreements with the appellants in this case -- two Delaware trusts named Green Gas and Pontiac -- both of which engaged tax-matters partners controlled, like RTC, by Rumpelstiltskin. Notwithstanding these connections, the Internal Revenue Service (IRS) stipulated in the Tax Court that RTC and the trusts were "unrelated" for purposes of tax law. Stipulation of Facts ¶¶ 14-15 (App. 361).

Under the agreements between RTC and the trusts, RTC sold the rights to produce landfill gas at each landfill to the trusts. It also agreed to maintain the landfill gas equipment at each landfill. The trusts, in turn, agreed to sell all landfill gas produced *back* to RTC. *Id.* ¶¶ 53-55 (App. 368-69).

During the relevant time period, only five of the 24 landfills that RTC managed had operational equipment capable of turning landfill gas into electricity. *Green Gas*, 147 T.C. at 15-16. At the other 19, the gas was simply vented (released) or flared (burned) into the atmosphere. *Id.* at 11-12. For those 19, therefore, RTC paid the appellant trusts for landfill gas that it did not -- and could not -- use productively.

What was the purpose of these byzantine arrangements? Largely, the appellants admit, to monetize tax credits provided under 26 U.S.C. § 45K. *See* Green Gas Br. 8-9. That statutory tax credit, which Congress first enacted in 1980, creates an incentive for the production and sale of energy from "nonconventional" sources. 26 U.S.C. § 45K(a). More specifically, it provides a credit of $3, multiplied by the "barrel-of-oil equivalent of qualified fuels[,] . . . sold by the taxpayer to an unrelated person during the taxable year," and "the production of which is attributable to the taxpayer." *Id.* § 45K(a)(2). We will have more to say about these and other statutory requirements later in this opinion.

Between 2005 and 2007, when the Section 45K credit expired, the appellants claimed $11.7 million in Section 45K credits for selling landfill gas to RTC. The overwhelming majority of those claimed credits came from venting/flaring landfills, where RTC made no (and could make no) use of the gas. *Green Gas*, 147 T.C. at 30.[1] Between 2006 and 2007, the appellants also sought to deduct $4.3 million in business expenses. U.S. Br. 17-19 (summarizing Stipulation of Facts).[2] During this time period, the appellants reported $4.5 million in income. Stipulation of Facts ¶ 1007 (App. 494); Pontiac Form 1065 (Apr. 15, 2007) (App. 792); Pontiac Form 1065 (May 20, 2008) (App. 806).

After an audit, the IRS Commissioner disallowed all but $586,000 of the trusts' Section 45K credits. *Green Gas*, 147 T.C. at 30. That figure, the Commissioner explained, excluded all claimed credits from venting/flaring landfills, as well as all claimed credits for landfill gas vented or flared from gas-to-electricity landfills when the gas-to-electricity equipment was non-operational. *See* Final Adjustment (Mar. 26, 2010) (App. 855-58); U.S. Br. 20. In addition, the Commissioner disallowed the bulk of the appellants' claimed business-expense deductions. Finally, the Commissioner determined that the appellants should be assessed a 20% accuracy penalty under 26 U.S.C. § 6662 for the 2006 and 2007 tax years. *See* Final Adjustment (Mar. 26, 2010) (App. 855-56).

---

[1] It is, perhaps, no coincidence that some of the intermediary entities were named Bye Bye Gas GP, C U Later Gas GP, Arrivederci Gas GP, Buon Giorno Gas GP, Ciao Gas GP, and Adios Gas GP. *See Green Gas*, 147 T.C. at 7 n.7.

[2] The appellants also deducted business expenses for 2005, which the Commissioner did not disallow. *See* Final Adjustment (Aug. 20, 2009) (App. 826-27); U.S. Br. 16 n.8.

The Tax Court affirmed the Commissioner's determinations in all respects. *Green Gas*, 147 T.C. 1. The appellants appeal the Tax Court's decision, maintaining that they should have received all of their claimed Section 45K credits and business deductions, and that the Commissioner should not have assessed an accuracy penalty. We have jurisdiction pursuant to 26 U.S.C. § 7482(a).

II

We first consider the Tax Court's decision to disallow Section 45K credits at the venting/flaring landfills and at the gas-to-electricity landfills during periods when gas-to-electricity equipment was non-operational and venting or flaring was used. The Tax Court gave two reasons in support of this holding: first, that venting and flaring do not satisfy the statutory requirements of Section 45K; and second, that the appellants failed to substantiate the amount of landfill gas they allegedly vented or flared. We review the Tax Court's legal conclusions de novo and its findings of fact for clear error. *Barnes v. Comm'r*, 712 F.3d 581, 582 (D.C. Cir. 2013). We owe the Commissioner no *Chevron* deference in his interpretation of Section 45K (nor does he request any), because he "makes no claim" to have reached that interpretation in a rulemaking or agency adjudication. *Id.* at 582-83 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)).

Section 45K is hardly a model of drafting clarity. The statute has several interlocking requirements for claiming a credit, four of which are relevant here: *First*, there must be a "qualified fuel[]," 26 U.S.C. § 45K(a)(2), which includes "gas produced from . . . biomass," *id.* § 45K(c)(1)(B)(ii). *Second*, the fuel must be "sold by the taxpayer to an unrelated person during the taxable year." *Id.* § 45K(a)(2)(A). *Third*, the qualified fuel must have been produced in a "facility for producing qualified

fuels" placed in service before July 1, 1998. *Id.* § 45K(f)(1)(A), (e)(1)(B). *Fourth*, the "production" of the qualified fuel must be "attributable to the taxpayer." *Id.* § 45K(a)(2)(B).

The Tax Court held, and the Commissioner does not dispute on appeal, that landfill gas is a "qualified fuel." 147 T.C. at 40-44. And, as we have already mentioned, the Commissioner stipulated that the appellants and RTC are "unrelated" parties within the meaning of this statute. *Id.* at 67. In this Part we focus our analysis on the third requirement. In Part III, we address the Tax Court's analysis of the fourth requirement. *See infra* note 3.

According to the Tax Court, in the context of landfill gas production, a "'facility for producing qualified fuels' under section 45K(f)(1) must allow a taxpayer to capture, sell, or even transform [landfill gas] into energy." 147 T.C. at 49. That conclusion followed from the court's view that Congress enacted Section 45K to "encourage production of energy from alternative sources to reduce the dependency on imported energy." *Id.* at 40. Hence, "the kind of facility Congress had in mind when enacting the [Section 45K] credit would be one that could produce energy or is connected to an energy production facility or is capable of storing or delivering fuel to a customer." *Id.* at 47. Systems like the venting/flaring landfills at issue here "do not qualify as a 'facility for producing qualified fuels,'" the court found, because they "are not meant to produce energy and do not capture any fuels which could be used by someone else for that purpose." *Id.* at 49.

We agree with the Tax Court that Congress appears to have intended Section 45K to reward the production of alternative energy, not the release of gas into the atmosphere. That intention is evident in the statute's text, which provides a credit for producing "fuels" and which prescribes that the credit will

be proportional to the "barrel-of-oil equivalent of qualified fuels." 26 U.S.C. § 45K(a)(2). This language suggests that only fuels that are capable of substituting for oil -- that is, only fuels that can be used to generate energy -- are eligible to receive tax credits. Had Congress instead intended to reward the release of gas into the atmosphere, it would have used very different language.

The appellants resist this conclusion by pointing to the floor statements of four legislators who voted to reauthorize Section 45K. Green Gas Br. 27. This effort is unpersuasive, and not only because floor statements are often weak evidence of congressional intent. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 12 (D.C. Cir. 2009). In this case, the floor statements the appellants cite actually cut against their reading of the statute. *See, e.g.*, 138 Cong. Rec. 27,052 (1992) (statement of Sen. Dole) ("Without [Section 45K], this gas will be simply vented into the atmosphere.").

We need not run the statutory issue to ground, however, because the Tax Court's other holding -- that the appellants failed to substantiate the amount of landfill gas that was vented or flared -- more than suffices to resolve this case.

Taxpayers are required to maintain records substantiating their claims for credits and deductions, 26 C.F.R. § 16001-1(a), and bear "the burden of demonstrating [their] clear entitlement," *Telecom\*USA, Inc. v. United States*, 192 F.3d 1068, 1072 (D.C. Cir. 1999). We review substantiation determinations for clear error. *Comm'r v. Simmons*, 646 F.3d 6, 12 (D.C. Cir. 2011).

The appellants offered three methods for measuring the amount of gas they vented or flared, each of which the Tax Court found unreliable. First, the appellants asserted that RTC employees maintained site logs measuring gas flow at many of

the landfills. The Tax Court, however, found those logs unconvincing. Many of the sites had "four logs or fewer," and "the data reported [was] statistically improbable because gas flow and methane concentrations remain[ed] the same over long periods." 147 T.C. at 64. Second, although the appellants claimed that they used software called LandGEM to measure landfill gas output, the Tax Court found that this software "is not designed to be a tool for monitoring or measuring gas production," and is not reliable for that purpose. *Id.* at 65. Third, the appellants alleged that they estimated landfill gas output based on "air emissions factors." The Tax Court disbelieved the testimony of the appellants' witness on this point, *id.* at 35, and described the method as "basically eyeball[ing] how much [landfill gas] was emitted from a particular landfill," *id.* at 66.

On this appeal, the appellants expend little energy arguing that the above findings were clearly erroneous. Instead, they assert that four legal errors infected the Tax Court's holding. We address each in turn.

First, the appellants argue that the Tax Court "implicitly" -- and erroneously -- required them to provide "a full, continuous record . . . of [landfill gas] flow and concentration measurements accomplished through a meter." Green Gas Br. 33. The Tax Court did no such thing. Rather, it simply found that the appellants' substantiating records were riddled with errors or otherwise not credible, a judgment with which we agree.

Second, the appellants aver that two of the employees who allegedly prepared 85% of the site logs died prior to the Tax Court's proceedings. Accordingly, the appellants contend, the court erred in employing a presumption that the appellants chose not to introduce testimony that might have corroborated the logs because that testimony would instead have been unfavorable.

*See* 147 T.C. at 65 (citing *Wichita Terminal Elevator Co. v. Comm'r*, 6 T.C. 1158 (1946)). We need not dwell on this objection because the Tax Court provided ample reasons why the logs were unreliable on their face. *See id.* at 63-64. And in any event, the court's presumption was appropriate given that the appellants could have introduced evidence from still-living employees who prepared the remaining 15% of the site logs, and yet chose not to do so. *See Huthnance v. District of Columbia*, 722 F.3d 371, 378 (D.C. Cir. 2013).

Third, the appellants object that, given the parties' stipulation that landfill gas contains "roughly" 50-55% methane, the Tax Court should not have rejected the appellants' use of 50% as a default value for assessing the percentage of methane in the gas flow reported in the logs. *See* Stipulation of Facts ¶ 56 (App. 369). This objection is unavailing because the Tax Court gave numerous other reasons why it did not find the appellants' logs credible. *See* 147 T.C. at 63-64. Moreover, the parties did not stipulate that every landfill has the same or a constant methane content -- indeed, the appellants' expert report stated that the methane content of landfill gas ranges from less than ten percent to over sixty percent, depending on the age of the landfill. Expert Report of Neil D. Williams 31 (Oct. 16, 2015) (App. 3374); *see Green Gas*, 147 T.C. at 10 ("Methane content in [landfill gas] varies over time and depends on many factors, including the life cycle of a landfill.").

Finally, the appellants argue that, even if they could not fully substantiate their landfill gas production, they should have been allowed to estimate that amount. This argument relies on *Cohan v. Commissioner*, in which Judge Learned Hand wrote that the predecessor of the Tax Court should "make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." 39 F.2d 540, 544 (2d Cir. 1930). Our court has explained, however, that

the *Cohan* rule is inapposite when "there are no reliable figures from which to calculate or extrapolate a reasonable estimate" of the taxpayers' entitlements. *Plisco v. United States*, 306 F.2d 784, 787 (D.C. Cir. 1962). Given the severity of the defects the Tax Court identified in the appellants' records, a *Cohan* estimate was not required.

For these reasons, we affirm the Tax Court's judgment that the appellants were not eligible for the Section 45K credits they claimed for venting or flaring landfill gas.[3]

## III

We now turn to the Tax Court's determination that some of the landfill gas claimed at gas-to-electricity landfills was not "attributable to the taxpayer," and thus not eligible for Section 45K credits on that ground. *See* 26 U.S.C. § 45K(a)(2)(B). Because the appellants' dispute with the Tax Court is ultimately a factual one, we review for clear error. *Barnes*, 712 F.3d at 582.

First, the Tax Court disallowed credits at three landfills because the appellants introduced no credible evidence that they had the rights to sell landfill gas at those landfills. 147 T.C. at 55-56. The appellants acknowledge that "the record did not contain a copy" of the agreements concerning those landfills. Green Gas Br. 43. But this absence was excusable, they maintain, because RTC's former president may have stolen those documents before leaving the company, or, alternatively,

---

[3] In light of our decision on this point, we need not address the Tax Court's alternative holding that vented/flared landfill gas was not "sold" within the meaning of Section 45K. 147 T.C. at 67-68; *see* 26 U.S.C. § 45K(a)(2)(A) (requiring that the fuel be "sold by the taxpayer to an unrelated person during the taxable year").

because RTC's bankruptcy trustee may have misplaced the documents.

The Tax Court did not clearly err in declining to accept those excuses. For one thing, any defects in RTC's record keeping do not explain why the appellants -- separate legal entities from RTC -- lack copies of the agreements they allegedly signed. For another, the Tax Court observed that the appellants managed to introduce evidence of the agreements at every venting/flaring landfill, making their failure to do so at these gas-to-electricity landfills all the more stark. 147 T.C. at 55.

Second, the Tax Court disallowed credits at the Pontiac, Illinois landfill after June 13, 2006. *Id.* at 57-60. On that date, a bankruptcy court in Chicago held that RTC's lease of the Pontiac landfill had expired. *See In re RTC*, 528 F.3d 467, 468 (7th Cir. 2008). This holding, the Tax Court concluded, meant that RTC had no authority to assign rights at the Pontiac landfill after June 13, 2006 -- and, therefore, that the appellants could not claim credits for selling landfill gas after that date.

The Tax Court's conclusion was not clear error. The appellants' sole argument to the contrary is that the agreement between RTC and the relevant appellant "is essentially a sublease, and the possessory rights of a sublessee are not impaired in bankruptcy unless they would be impaired under applicable state law." Green Gas Br. 46. We need not decide whether that proposition is correct as a matter of bankruptcy law because, even if it were, Illinois law (which governs the contract at issue) states that "the termination of [a] top lease ipso facto works a termination of a sublease." *Arendt v. Lake View Courts Assocs.*, 366 N.E.2d 1096, 1097-98 (Ill. App. Ct. 1977) (internal quotation marks omitted). Accordingly, the Tax Court did not

clearly err in holding that the appellants had no rights to the Pontiac landfill after RTC's lease terminated.

IV

We next address the Tax Court's decision to disallow the bulk of the appellants' business-expense deductions. 147 T.C. at 68-73; *see* 26 U.S.C. § 162(a). The "burden of clearly showing the right to the claimed deduction is on the taxpayer," *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (quoting *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943)), and the Tax Court found that the appellants failed to produce records that would allow them to carry that burden, *see* 26 C.F.R. § 1.6001-1(a). 147 T.C. at 68-73. We review that determination for clear error. *Barnes*, 712 F.3d at 582.

We find no clear error in the Tax Court's findings. The court determined that the appellants could not deduct operation-and-maintenance expenses at landfills where they could not produce any operation-and-maintenance agreements, and where they failed to introduce any "evidence showing that any payments were actually made, such as bank records." 147 T.C. at 70. For a separate landfill, the court held that no operation-and-maintenance expenses were deductible after June 16, 2006, when the relevant appellant and RTC were barred from the landfill following a dispute with the landfill owner. *Id.* at 72-73.

As to the appellants' claimed deductions for consulting and legal fees, the Tax Court determined that the appellants "failed to provide a credible explanation" for why the consulting fees were "paid by other entities but deductions were claimed by" appellant Green Gas. *Id.* at 70. And it held that the appellants could not claim legal-fee deductions because there was no evidence that any legal work benefited the appellants. *Id.* at 70-71. Finally, it disallowed various miscellaneous expenses,

except to the extent that the appellants could corroborate them with documentation. *Id.* at 71-72.

All of these determinations were reasonable and supported by the record, and we have no cause to overturn them. Nor, for the reasons explained above, do we accept the appellants' argument that the Tax Court should have applied a *Cohan* estimate rather than reject the expenses entirely. We therefore affirm the Tax Court on this issue.

V

Finally, we consider whether the Tax Court properly approved a 20% accuracy-related penalty under 26 U.S.C. § 6662(a). 147 T.C. at 74-78. That section permits the Commissioner to impose a penalty of 20% of "the portion of any underpayment which is attributable to," inter alia, "[n]egligence or disregard of rules or regulations." 26 U.S.C. § 6662(b); *see id*. § 7491(c) (providing that the Commissioner bears the burden to support a penalty). "Because the Tax Court's assessment of an accuracy-related penalty is a factual determination, it is reviewed for clear error." *Rogers v. Comm'r*, 783 F.3d 320, 327 (D.C. Cir. 2015) (internal quotation marks omitted).

Under IRS regulations, "negligence includes . . . . any failure by the taxpayer to keep adequate books and records or to substantiate items properly." 26 C.F.R. § 1.6662-3(b)(1). As should be clear to the reader by this point, the Tax Court did not clearly err in holding that the appellants' record-keeping practices satisfied this definition. The appellants' multiple excuses -- their documents were stolen by RTC's disgruntled former president, their documents were seized during bankruptcy, the dog ate their homework, and the like -- cannot explain the fact that they submitted hardly any documentation of the key facts underlying their credit and deduction claims.

Nor did the Tax Court clearly err in rejecting the appellants' claim that they acted "with reasonable cause and in good faith," such that no accuracy penalty should issue. 147 T.C. at 76; *see* 26 C.F.R. § 1.6664-4. On appeal, the appellants do not attempt to defend the position they took below -- that they followed the advice of a tax professional -- likely because the Tax Court found that "the record is devoid of evidence that [the appellants] received any written advice on tax issues from anyone." 147 T.C. at 77. Instead, they claim that they followed industry best practices in maintaining their records, and hence should not be penalized. Green Gas Br. 55. But the appellants have cited no authority for that claim, either on appeal or before the Tax Court, *see* Green Gas Tax Court Opening Br. 123-24 (Feb. 22, 2016) (App. 173-74), and we therefore decline to accept it.

VI

For the foregoing reasons, the judgment of the Tax Court is

*Affirmed*.